
FILED
JUN 11 2012

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

---

STACY J. MONGAR,

        Plaintiff,

vs.

HARTFORD FIRE INSURANCE
COMPANY,

        Defendant.

No. 12-4101

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, Stacy J. Mongar ("Plaintiff") for her Complaint against Defendant Hartford Fire Insurance Company (hereinafter "The Hartford" or "Defendant") states and alleges as follows:

## JURISDICTION AND VENUE

1.    Plaintiff, a female employed by the Defendant from June 11, 2002, to April 28, 2011, brings this action under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a). As a result, this Court has subject matter jurisdiction of this dispute under 28 U.S.C. § 1331.

2.    Under 28 U.S.C. § 1367, this Court has pendant jurisdiction for the state claims asserted herein.

3.    Under 28 U.S.C. § 1391, venue is proper in the District of South Dakota because a substantial part of the events or omissions giving rise to the claims occurred in the District of South Dakota.

## PARTIES

4.    Plaintiff was at all times material hereto an employee of Defendant and a resident of Sioux Falls, Minnehaha County, South Dakota.

5. The Hartford was at all times material hereto a Connecticut corporation doing business in, among other areas, South Dakota, including but not limited to, Sioux Falls, South Dakota.

## FACTS

6. Plaintiff began working at The Hartford on June 11, 2002, as an administrative assistant for Steve Vardsveen ("Vardsveen"). At the time, Vardsveen was the sole account executive for The Hartford in South Dakota.

7. In 2004, Plaintiff was promoted to the position of account executive for The Hartford. As an account executive, Plaintiff acted as a consultant for financial planners and brokers, who were her primary customers. Plaintiff would meet with financial planners and brokers and assist them in obtaining the appropriate financial and insurance products from The Hartford. Plaintiff had a few retail consumers as customers.

8. When Plaintiff was promoted to the position of account executive in 2004, Plaintiff and Vardsveen formed a partnership. As part of that partnership, they divided their commissions and expenses. Plaintiff received 20 percent of the net income, and Vardsveen received 80 percent of the income.

9. As an account executive, Plaintiff reported to Dan Cassada ("Cassada"), the Assistant Vice-President of Life Sales for The Hartford. Vardsveen reported to Cassada before 2004.

10. Upon information and belief, Cassada had a pattern of treating female employees, including but not limited to Plaintiff, differently and worse than similarly-situated male employees.

2

11. In 2006, Plaintiff became concerned about the ethics of some of Vardsveen's conduct. Plaintiff reported these concerns. Based on these concerns, Plaintiff and Vardsveen dissolved their partnership.

12. Cassada treated Vardsveen, a similarly-situated male, differently than Plaintiff during the dissolution of the partnership, including but not limited to the division of territories and assignment of broker-dealer. For example, Vardsveen's territory gave him nearly all the territories for Edward Jones, a broker-dealer who has a network of financial advisors, in South Dakota. These Edward Jones territories were lucrative and appealing. The only Edward Jones territories received by Plaintiff were in Sioux Falls. Plaintiff received a few other accounts. This example is just one of multiple times Cassada treated Vardsveen differently than Plaintiff regarding the division of territories or assignment of broker/customer.

13. After the dissolution of the partnership, both Mongar and Vardsveen worked as account executives and reported to Cassada.

14. Beginning in 2006, Cassada also treated Vardsveen and Plaintiff differently in reassigning territories between them. At various other times, Cassada reassigned territories from Plaintiff to Vardsveen if a broker/customer requested to work with Vardsveen. When a broker/customer requested to work with Plaintiff, however, Cassada refused to reassign the broker/customer from Vardsveen to Plaintiff.

15. During 2007, Cassada treated Plaintiff and Vardsveen differently regarding the consequences of working with a broker/customer to which there was a dispute as to whom they were assigned. Plaintiff was reprimanded and risked forfeiture of commissions for working with brokers/customers that Vardsveen believed were assigned to him. Conversely, Vardsveen was not disciplined when working with brokers/customers believed by Plaintiff to be assigned to her.

Cassada also treated Plaintiff and Vardsveen differently regarding reimbursement from the "house" account for commissions allegedly lost due to disputes regarding to whom the broker/customer was assigned.

16. In August of 2007, Plaintiff reported to The Hartford's Human Resources Department the discrimination occurring during the dissolution of the partnership, division of territories, and differential treatment related to when there was a dispute to whom a broker/customer was assigned. Upon information and belief, The Hartford approached Cassada and disciplined him relating to Plaintiff's discrimination complaint. At the same time, The Hartford advised Plaintiff that it investigated the allegations and found no discrimination. Following this report of gender discrimination, Cassada became hostile to the Plaintiff and increasingly critical of her job performance.

17. From on or about 2007 until 2011, Cassada's pattern of discriminatory conduct continued by imposing additional restrictions on Plaintiff or manipulating Plaintiff's territories or brokers/customers which made it more difficult for her to earn commissions and reach her sales targets when compared to similarly situated male account executives.

18. In 2007, Cassada also treated Plaintiff differently than similarly-situated male employees regarding use of a Private Wealth Management ("PWM") consultant. PWM consultants can be used to assist account executives in planning for certain, larger clients with more complex estates. While Cassada required Plaintiff to obtain permission to use a PWM consultant, similarly-situated male employees could call a PWM consultant directly at any time at their discretion. Cassada refused to allow Plaintiff to contact PWM consultants without his permission.

19. Also starting in 2007, and continuing through 2011 when Plaintiff's employment terminated, Cassada treated Plaintiff different than similarly-situated male employees regarding providing her with an administrative assistant. In 2007, Plaintiff reached the sales criteria for receiving and did request to receive an administrative assistant. Cassada refused to provide her an administrative assistant. All other male account executives who reported to Cassada and who met the sales criteria received an administrative assistant. Plaintiff continued to request an administrative assistant multiple times up through the spring of 2011. She never received an administrative assistant, which made it more difficult for her to perform her duties and responsibilities compared to similarly-situated male employees.

20. In 2009, a portion of Plaintiff's territory in Iowa was reassigned to a male account executive. Plaintiff offered to assist the account executive in meeting her former broker/customer. The new account executive refused. Later, after the account executive experienced some difficulty in servicing the accounts, Plaintiff received a reprimand from Cassada in 2010 for failing to provide a "handoff" of her accounts. Plaintiff is not aware of any male account executives being required to perform a "handoff" when territories were reassigned.

21. Cassada continued his discrimination by reassigning territories away from Plaintiff. In the spring of 2010, Plaintiff was servicing a territory in Pierre, South Dakota, for Woodbury Financial, which is owned by The Hartford. On March of 2010, Cassada informed Plaintiff in an email that Woodbury Financial believed that the territory needed a "good ole' farm boy" to get the job done. Pursuant to Woodbury Financial's request, Cassada removed Plaintiff as the primary contact person for the territory. The person that replaced Plaintiff was male but had no agricultural background.

22. In May of 2010, Plaintiff reported Cassada's remark that the Pierre, SD, territory needed a "good ole' farm boy" to get the job done and the subsequent removal of Plaintiff as the primary contact person for the territory to The Hartford's Human Resources Department. Following Plaintiff's report, The Hartford allegedly investigated the report but concluded no discrimination occurred. As described below, after this second report of gender discrimination, Cassada became increasingly hostile to Plaintiff and routinely made demands of Plaintiff that were different than the demands he made of similarly-situated male employees.

23. At the time of Plaintiff's second gender discrimination complaint, Plaintiff was the only female account executive who reported to Cassada. Five male account executives reported to Cassada.

24. From on or about September of 2010 to April of 2011, Cassada treated Plaintiff differently than similarly-situated male employees by requiring Plaintiff to be sitting at her computer in her office on Monday morning conference calls. This restriction was not imposed on any of the male account executives, who would often call from their cell phones while traveling. This restriction made it more difficult for Plaintiff to perform her duties. Plaintiff covered a broad territory of brokers/customers over three states, and she frequently had to travel to service her brokers/customers. Requiring Plaintiff to be at her desk Monday morning prevented her from traveling on Monday mornings to service her brokers/customers.

25. From on or about February of 2011 to April of 2011, Cassada treated Plaintiff differently than similarly-situated male employees regarding the assignment of brokers based upon productivity goals. Cassada required that Plaintiff's brokers reach sales minimums, and if they did not reach those minimums, Cassada would reassign the broker to a male account executive. Cassada did not impose sales minimums on the brokers assigned to the male account

executives. If reassigned, the male account executive would receive the commissions for policies that broker purchased. While Cassada demanded that Plaintiff meet productivity levels from specific brokers she serviced, he did not make this same demand of similarly-situated male employees. Plaintiff's failure to meet the productivity requirements Cassada set would result in the reassignment of the brokers/customers to other account executives, which in turn decreased Plaintiff's capacity to earn commissions.

26. Like Cassada, The Hartford, upon information and belief, has a pattern of treating female employees differently than similarly-situated males and engaging in sexual harassing conduct. The gender harassing culture of The Hartford is systemic throughout the organization.

27. On or about December 2010, Plaintiff had a telephone conference with William Hathaway, who was an independent broker selling insurance policies for, among others, Lincoln Benefit Life. At the request of Plaintiff's broker, Plaintiff called Hathaway to inquire whether he could assist the broker with a customer.

28. During the call with Hathaway, Plaintiff also inquired about the underwriting status of policies for a Wells Fargo broker. Plaintiff, on behalf of The Hartford, and Hathaway, on behalf of Lincoln Benefit Life, were both preparing quotes for policies for the Wells Fargo broker. Plaintiff inquired about what instructions Hathaway received from the Wells Fargo broker regarding the policies because Plaintiff wanted to obtain the policies.

29. Cassada later learned about Plaintiff's conversation with Hathaway and launched an internal investigation at The Hartford for allegedly engaging in antitrust violations. Upon information and belief, Cassada used the internal investigation to continue his pattern of gender discrimination and retaliation against Plaintiff.

30. As part of this investigation, Plaintiff was interviewed on April 1, 2011. When she asked Cassada the purpose of the meeting, he refused to inform her. Instead, she was forced to drive to Minneapolis, Minnesota, to meet with the investigator without any prior notice of the allegation.

31. During the interview, Plaintiff was interviewed by Brian Erickson, an investigator for The Hartford, and Marianne Otting, a member of the Humans Resources Department for The Hartford. The interview lasted approximately four hours. Plaintiff was not represented by counsel during the interview. She was stressed and at one point asked to call her husband. The investigator told her that she had committed criminal activity and could face jail time. During the interview, Plaintiff was provided and signed a statement. Although Plaintiff asked for changes to the statement as it did not accurately reflect what happened, not all her requested changes were made. Plaintiff asked for a copy of the statement, but The Hartford refused to provide her with a copy of it.

32. As part of the investigation, no one at The Hartford contacted or interviewed Mr. Hathaway.

33. The Hartford terminated Plaintiff's employment with The Hartford on April 28, 2011. Although The Hartford claims it terminated Plaintiff's employment because she violated The Hartford's antitrust policies, this justification, upon information and belief, is a pretext. Upon information and belief, The Hartford terminated Plaintiff's employment as part of a pattern of continued gender discrimination and/or in retaliation for Plaintiff's prior discrimination complaints.

34. Plaintiff did not violate The Hartford's antitrust policy.

35. Upon information and belief, Cassada, even if not the ultimate decision-maker regarding the termination of Plaintiff's employment, performed an act or series of acts motivated by a discriminatory basis that was intended to cause and that proximately caused an adverse employment action by The Hartford against Plaintiff.

36. Other similarly-situated male employees received less severe discipline for violation of The Hartford's employment policies.

37. Cassada and The Hartford engaged in a pattern of adverse employment activities, including but explicitly not limited to division of territories, the reassignment of brokers, and the change in the terms and conditions of her employment, discipline, and/or the termination of her employment, which was all motivated by Plaintiff's gender and/or retaliation for reporting the gender discrimination against her.

38. Upon information and belief, Cassada is no longer employed by The Hartford.

39. The Hartford's discrimination and retaliation against Plaintiff, including but not limited the termination of Plaintiff's employment, proximately caused Plaintiff to incur substantial past and future damages, including but not limited to lost wages in the past and future, loss of employee benefits, loss of a company vehicle, emotional distress, loss of enjoyment of life, harm to Plaintiff's business reputation, and other non-pecuniary losses.

40. On September 8, 2011, Plaintiff filed a Charge of Discrimination against Defendant for discrimination on the basis of gender and retaliation with the South Dakota Division of Human Rights. A true and correct copy of this Charge is attached as Exhibit A and incorporated herein by reference.

41.     On March 21, 2012, the Equal Employment Opportunity Commission mailed a "Notice of Right to Sue" to Plaintiff. A true and correct copy of this Notice is attached as Exhibit B and incorporated herein by reference.

## COUNT I

### *Violation of Title VII of the Civil Rights Act*

42.     Plaintiff incorporates paragraphs 1-41 of this Complaint as if fully restated herein.

43.     Defendant was an "employer" at all times material herein within the meaning of Title VII of the Civil Rights Act.

44.     Defendant is engaged in an "industry affecting commerce" within the meaning of Title VII of the Civil Rights Act.

45.     Plaintiff is a member of a class protected by Title VII of the Civil Rights Act.

46.     Plaintiff was qualified for her position as an account executive at The Hartford.

47.     Plaintiff suffered an adverse employment action based on her gender as described in paragraphs 1-41 above, including but explicitly not limited to the division of territories, the reassignment of brokers, and the change in the terms and conditions of her employment, discipline, and/or the termination of her employment.

48.     While an employee for Defendant, Plaintiff was treated differently than similarly-situated male employees due to her gender as described in paragraphs 1-41 above, including but explicitly not limited to the division of territories, reassignment of brokers, the terms and conditions of her employment, and discipline, and/or termination of her employment.

49.     Defendant's actions described toward Plaintiff as described in paragraphs 1-41 above are on the basis of her gender and constitute a discriminatory employment practice prohibited by Title VII of the Civil Rights Act.

50. Both Cassada and The Hartford engaged in a pattern of discrimination based upon gender.

51. The unlawful employment practices of which Plaintiff complains were intentional or were done with malice and reckless indifference to Plaintiff's federally protected rights.

52. Defendant's discriminatory employment practices based on Plaintiff's gender have caused her to suffer damages in an amount to be proven at trial.

53. Because Defendant's discriminatory employment practices were intentional or were done with malice or reckless indifference to Plaintiff's federally protected rights, Plaintiff is entitled to recover punitive damages.

54. Under Title VII of the Civil Rights Act, Plaintiff is entitled to her reasonable attorneys' fees, litigation expenses, and costs incurred in this action.

## COUNT II

### *Retaliation*

55. Plaintiff incorporates paragraphs 1-54 of the Complaint as if fully restated herein.

56. Plaintiff engaged in a protected activity when she reported the gender discrimination against her.

57. Plaintiff provided the Defendant actual or constructive knowledge of Plaintiff's activities protected by Title VII of the Civil Rights Act because Plaintiff communicated the discrimination complaints to the employees of the Defendant.

58. Plaintiff suffered an adverse employment action due to her engagement in protected activity as described in paragraphs 1-41 above, including but explicitly not limited to the division of territories, reassignment of brokers, the terms and conditions of her employment, and discipline, and/or termination of her employment.

59. The facts surrounding the adverse employment action indicate that it was motivated by retaliation for Plantiff engaging in protected activity.

60. A causal link exists between Plaintiff's protected activities and the adverse employment action.

61. Defendant's retaliation against Plaintiff for engaging in protected activities is prohibited by Title VII of the Civil Rights Act.

62. Defendant's retaliation against Plaintiff for engaging in activities protected by Title VII of the Civil Rights Act was intentional or was done with malice and reckless indifference to Plaintiff's federally protected rights.

63. Defendant's retaliation against Plaintiff for engaging in activities protected by Title VII of the Civil Rights Act has caused her to suffer damages in an amount to be proven at trial.

64. Because Defendant's discriminatory employment practices were intentional or were done with malice or reckless indifference to Plaintiff's federally protected rights, Plaintiff is entitled to recover punitive damages.

65. Under Title VII of the Civil Rights Act, Plaintiff is entitled to her reasonable attorneys' fees, litigation expenses, and costs incurred in this action.

## COUNT III

### *Intentional Infliction of Emotional Distress*

66. Plaintiff incorporates paragraphs 1-65 of the Complaint as if fully restated herein.

67. Defendant engaged in extreme and outrageous conduct by discriminating against Plaintiff on the basis of gender and retaliating against her for engaging in protected activities.

68. Defendant intended to cause or recklessly cause Plaintiff severe emotional distress.

69. Defendant's conduct, in fact, caused Plaintiff to suffer severe emotional distress.

70. Plaintiff has suffered an extreme, disabling emotional response to Defendant's conduct.

71. Plaintiff has been damaged, in an amount to be determined, in trial, as a result of Defendant's intentional infliction of emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. For Plaintiff's damages in an amount to be determined at trial;

B. For front pay in an amount to be determined at trial;

C. For punitive damages in an amount to be determined at trial;

D. For attorneys' fees, costs, and disbursements incurred herein; and

E. For such other and further relief as the Court deems just and equitable under the circumstances.

Dated this 11 day of June, 2012.

_____
Thomas J. Welk
Jason R. Sutton
Meghann M. Joyce
BOYCE, GREENFIELD, PASHBY & WELK, LLP
300 S. Main Ave.
P.O. Box 5015
Sioux Falls, SD  57117-5015
(605) 336-2424
*Attorneys for Plaintiff Stacy J. Mongar*

13

## **JURY DEMAND**

Plaintiff hereby demands a jury trial on any and issues triable by a jury.